## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHERENE FAGON, | : | |
| ADMINISTRATOR OF THE ESTATE | : | |
| OF ZOE DOWDELL, | : | No. 3:18-CV-01594 (VLB) |
| Plaintiff, | : | |
| | : | |
| v. | : | December 4, 2023 |
| | : | |
| MARCIN RATAJCZAK, | : | |
| CHRISTOPHER KIELY, MICHAEL | : | |
| SLAVIN, KYLE JONES, CHAD | : | |
| NELSON, CITY OF NEW BRITAIN, | : | |
| & JAMES WARDWELL, | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 85]

On December 14, 2017 shortly before 7 p.m., approximately two hours after sunset, New Britain police officers fatally shot Zoe Dowdell.  Mr. Dowdell (age 20) had been driving Caleb Tisdol (age 15) and Noah Young (age 18) through an east-side New Britain neighborhood in a green, two-door 1996 Toyota Paseo.[1]  The two young adults and minor teenager were Black males.  The New Britain Police Department ("NBPD") believed the Paseo was involved in two "carjacking style" robberies that took place three days earlier. NBPD vehicles followed the Paseo and eventually cornered the car on a horseshoe-shaped set of streets abutting an elementary school.  Within a few seconds, NBPD officers exited their vehicles and approached the car while it reversed.  NBPD officers shot at the Paseo's occupants as Mr. Dowdell attempted to drive away.  They shot Tisdol twice in the leg.  They

---

[1] While Tisdol was a minor at the time of the incident, he has since reached adulthood and his identity is public in this case.

shot Mr. Dowdell in the back of the head, the neck, the leg, and the hand.  Mr. Dowdell was dead on arrival at St. Francis Hospital.

Sherene Fagon, Administrator of the Estate of Zoe Dowdell ("Plaintiff" or the "Estate") sues the City of New Britain, the Chief of Police James Wardwell, and all NBPD officers who discharged their firearms: Detectives Marcin Ratajczak and Christopher Kiely, and Officers Michael Slavin, Kyle Jones, and Chad Nelson ("Officer Defendants").  The Estate brings an excessive force claim against the individual defendants in violation of the Fourth and Fourteenth Amendments, as enforced through sections 1983 and 1988 of Title 42 of the United States Code (Count One); an indemnification claim against the City of New Britain under section 7-465 of the Connecticut General Statutes (Count Two); and a *Monell* liability claim against the City of New Britain and Chief Wardwell due to inadequate policies and customs leading to the officers' use of excessive force (Count Three).  Defendants move for summary judgment on all Counts. For the following reasons, the motion is DENIED.

I.      FACTS

The following facts are taken from the admitted Local Rule 56 statements of material facts and evidence cited by the parties. In summary, the record includes officers' sworn statements, deposition testimony, two dash cam videos, Shooting Review Board investigation reports, and NBPD policies.  The facts are read in the light most favorable to the non-movant, the Estate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

2

### A.    <u>Robbery Victims' Reports</u>

On December 11, 2017, shortly before 11:00 PM, the NBPD received two complaints of "'armed carjacking' style robberies." (Dkt. 89-11 (56(a)(2) Stmt.) ¶¶ 3–4.) The record does not include the victim complaints. Instead, the descriptions of these robberies come from the sworn statements of Defendants Slavin, Kiely, Nelson, Jones, Ratajczak; Detective Strzalka; and Sergeant Jones; which they wrote in response to the fatal shooting of Mr. Dowdell. These sworn statements are dated between January 3 and February 16, 2018, two weeks to two months after the fatal shooting.

The first robbery took place at 13 Kelsey Street while the victims were sitting in their running vehicle. (*Id.* ¶ 3.) Four to five males—one described as "possibly Hispanic" and another as Black—approached the car. (Dkts. 85-4 (Summ. J. Ex. A, Investigation Report.) at 16, 85-5 (Summ. J. Ex. B, Slavin Stmt.) at 1.) One suspect approached the passenger side of the vehicle, "racked" a gun, pointed it at one of the victims and demanded, "Give me everything." (Dkts. 85-4 at 16, 85-5 at 1.) Officer Slavin's sworn statement indicates that the victim described this suspect as "5'8" tall, skinny build." (Dkt. 85-5 at 1.) Another suspect, a Black male, "pistol whipped" a victim. (Dkt. 89-11 ¶ 3.) None of the victims provided a detailed description of any of the perpetrators. The suspects took a cell phone that had fallen on the ground and fled in what was described as a "green colored, older Geo Storm." (Dkts. 85-4 at 16, 85-5 at 1.)

The second robbery occurred at 58 Fairview Street. (Dkt. 89-11 ¶ 4.) The victims were backing out of the driveway when an "older green car, specifically a

Toyota" slowed down and blocked the driveway.  (*Id.* (citing Dkt. 85-5 at 2).)  Three to four males got out of the green car and approached the victims' car.  (*Id.*)  According to Officer Slavin's sworn statement, victims described the suspects as Black males who "appeared to be in their early twenties."  (Dkt. 85-5 at 1.)  Two suspects approached either side of the victims' car with guns and one suspect stood at the front of the car.  (*Id.*)  The victims backed their car out of the driveway, striking the suspects' car in the process, and were able to get away.  (Dkt. 89-11 ¶ 4.)  At some point during the incident, the suspects discharged their firearms.  (*Id.*)  As with the first robbery, the victims did not describe the perpetrators with any detail.

The NBPD subsequently searched for the vehicle.  On December 13, 2017, they located a two-door, turquoise green 1996 Toyota Paseo with a New Hampshire license plate number of 1810922.  (Dkt. 89-11 ¶¶ 1, 5.)  Officer Slavin stated that NBPD officers "observed there to be new damage to the vehicle in the area where the victim of the Fairview St[reet] incident would have struck the suspect vehicle."  (Dkt. 85-5 at 2.)  Officers took photographs of the car and the 58 Fairview victims positively identified the car.[2]  (Dkt. 89-11 ¶ 5.)  Sergeant Prisavage issued a "BOLO" (i.e., "Be On the Look Out") message with a description of the Paseo and its license plate.  (*Id.* ¶ 6.)

### B.   December 14, 2017

The fatal shooting of Mr. Dowdell occurred after sunset on December 14, 2017, three days after the robbery complaints.  (*See* Dkt. 85-4 at 1.)  That day, the

---

[2] These photographs were not submitted into evidence.

4

NBPD pulled officers working other cases to patrol the area where the robberies occurred.  (Dkt. 89-11 ¶ 8.)

The record identified the NBPD vehicles directly involved in the incident as:

(1)  Members of the Street Crimes Unit—Sergeant Blackmore, Detective Smith, Defendant Nelson and Defendant Jones—patrolled in an unmarked Ford Taurus driven by Defendant Nelson ("Unmarked Street Crimes Taurus").  (*Id.* ¶ 9.) Both Defendants Nelson and Jones wore street clothes with a tactical vest labeled "POLICE" on the front and back.  (*Id.* ¶ 10.)

(2)  Members of the Special Services Unit—Defendant Ratajczak, Detective Silverio, and Defendant Slavin—patrolled in an unmarked Acura RL driven by Defendant Ratajczak ("Unmarked Acura").  (*Id.* ¶ 11.)  Both Defendants Ratajczak and Slavin wore street clothes with their badges on the front of their belts.  (*Id.* ¶¶ 12–13.)

(3)  Members of the Criminal Investigations Division—Sergeant Prisavage and Defendant Kiely—patrolled in an unmarked Ford Taurus ("Unmarked Criminal Investigations Taurus").  (*Id.* ¶ 14.)  Defendant Kiely wore street clothes with his badge around his neck.  (*Id.* ¶ 15.)

(4)  Sergeant Webster and Detective Strzalka patrolled in an unmarked Toyota Camry ("Unmarked Camry").  (*Id.* ¶ 16.)

(5)  Officer Egan drove a marked K-9 vehicle ("Marked K-9 Car").  (*Id.* ¶ 20; Dkt. 85-4 at 2.)

(6)  Sergeant Mocarsky drove a marked SUV ("Marked SUV").  (Dkt. 89-11 ¶ 20; Dkt. 85-4 at 2.)  The dash cam video from this car has been submitted into evidence.  (*See* Dkt. 85-16 (Summ. J. Ex. M, Mocarsky Video).)

Around 6:30 PM, the Unmarked Acura team identified the Paseo.  (Dkt. 89-11 ¶ 17.)  The Paseo appeared to have three occupants.  (*See* Dkt. 85-4 at 2, 16; 85-5 at 1; 89-11 ¶ 4.)  Defendant Jones admitted in his deposition that the NBPD did not have independent information connecting the individuals in the Paseo to the suspects from the robberies.  (Dkt. 89-3 (Opp'n Ex. 3, Jones Dep.) at 33:3–10, 48:3–50:3.)  The Paseo drove eastbound on Chestnut Street.  (*Id.*)  The Unmarked Acura radioed their location and the other NBPD members responded to the area.  (*Id.*)

According to Defendant Slavin's sworn statement, the Unmarked Acura discretely followed the Paseo as it "continued to drive around neighborhood streets on the east side of New Britain slowly and with no particular purpose (circling the same streets, etc.)."  (Dkt. 85-5 at 3.)  On a few occasions, the Paseo passed a parked, running vehicle with lights on—it approached the vehicle and drove slowly past.  (*Id.*)  Several NBPD cars were in the area "but were staying far enough back from the Toyota so the occupants of the Toyota would not catch on that police were looking for them and drive off at a high rate of speed."  (*Id.*)

At some point, the Paseo turned left on Chapman Street and began driving northbound.  (*Id.* at 4.)  Chapman Street intersects with Newington Avenue, which is an eastbound-westbound road.  Chapman Street continues north of Newington but only for half a block, at which point it meets a "T" at Chapman Court.  The right side of the "T" leads to Chamberlain Elementary School's parking lot.  The left side

of the "T" is approximately four houses long and then turns into Carlson Street, which bends southbound and connects with Newington Avenue. (*See id.*)  In other words, Chapman Street, Chapman Court and Carlson Street create a horseshoe off of the north side of Newington Avenue.  Sergeant Webster informed the NBPD to block in the Paseo if it drove into this horseshoe area. (*Id.*)

The Paseo drove north of Newington Avenue and entered the horseshoe area.  The Unmarked Acura and the two Unmarked Tauruses followed the Paseo, while the Unmarked Camry turned left onto Newington Avenue. (Dkt. 85-4 at 2.) The Unmarked Camry then took a right onto Carlson Street, following Officer Egan's Marked K-9 Car and Sergeant Mocarsky's Marked SUV, so the three vehicles could position themselves to block in the Paseo. (*Id.*)

C.    <u>Dash Cam Footage</u>

The record includes two dash cam videos—the only video evidence in the record—from Sergeant Mocarsky and Officer Coleman.  Sergeant Mocarsky's Marked SUV was one of three vehicles blocking Carlson Street, (Dkt. 85-16), and Officer Coleman entered the scene from the opposite side, through Chapman Street, (Dkt. 85-18 (Summ. J. Ex. O, Coleman Vid.)).  The video footage shows night visibility conditions with snow on the ground and in the road.  Out of the two videos, only Sergeant Mocarsky's SUV dash cam captures the detailed moments when the police vehicles converge with and block the Paseo, the officers exit their vehicles while brandishing their firearms, the officers surround the Paseo, and the officers fire numerous shots into the Paseo wounding Tisdol and fatally striking

Mr. Dowdell.   These events take place during the sixth minute of Sergeant Mocarsky's dash cam footage, as referenced below.  (*See* Dkt. 86-16.).

**5:57 to 6:30**.  At 5 minutes and 57 seconds, the Marked SUV takes a left onto Newington Avenue after traveling southbound on East Street.  The Marked SUV then takes a left onto Carlson Street at 6 minutes and 15 seconds.  By 6 minutes and 30 seconds, the Marked K-9 Car and the Marked SUV have blocked off Carlson Street at the bend in the road where Carlson Street meets Chapman Court.  The Paseo is stopped on Chapman Court, facing the two Marked Cars.  The passenger side of the Paseo is close to the curb where there is a sidewalk and an embankment (approximately five steps high) that leads to a three-story home.

**6:32 to 6:35**.  At 6 minutes and 32 seconds, the stopped Paseo begins to reverse.  The wheels turn a quarter revolution but then the Unmarked Acura, approaching from behind, hits the rear of the Paseo on the driver's side, which causes the Paseo to angle more directly toward the sidewalk.  The Paseo continues to reverse in what appears to be a three-point turn.  At the 33rd second, the Paseo reverses toward the sidewalk, hits the front passenger side of the Unmarked Acura with the rear of the driver's side, and continues reversing while the front passenger of the Unmarked Acura exits.  In this frame, the Unmarked Street Crimes Taurus pulls up between the Unmarked Acura and the sidewalk.  The Paseo continues to reverse from seconds 34 through 35, and the Paseo's driver's side scrapes along the front of the Unmarked Street Crimes Taurus.  During this time, the Marked SUV continues to drive forward towards the Paseo.

By 6 minutes and 35 seconds, the Paseo is largely or entirely off the road, perpendicular to the sidewalk with the rear facing up the embankment.  The front corner of the Paseo on the passenger side is touching the Marked SUV and the driver's side faces the sidewalk (leading in the direction toward Chamberlain Elementary School).  Approximately ten feet away from the Paseo on the left of the sidewalk, there is a small staircase leading to the three-story home.  A few feet past the staircase on the right side of the sidewalk, there is a telephone pole between the sidewalk and the road and a driveway immediately in front of the telephone pole.  The front of the car is blocked in by the Unmarked Street Crimes Taurus and the Marked SUV.

6:36 to 6:40.  The Paseo appears to be stuck perpendicular to the sidewalk for a few seconds, and it makes a sound as if the driver's foot is on the pedal attempting to dislodge the car from its stuck position.  At 6 minutes and 38 seconds, multiple members of the NBPD can be heard yelling, but the words are not discernible.  It is undisputed that Defendants Ratajczak, Slavin, Kiely, Jones and Nelson as well as Officer Strzalka, Sergeants Blackmore and Prisavage, and Detective Smith, exited their vehicles.  (Dkt. 89-11 ¶ 25.)  Two plain clothes officers enter the frame at the 39th second by running onto the sidewalk on the driver's side with their firearms drawn.  One is wearing a tactical vest and the other is wearing a black jacket; while the word "POLICE" is written on the front of their clothing, it is not visible in the video due to the angle in which the officers are running and the fact they are holding their firearms chest high in front of them with both hands, obscuring the insignia on their chests.  Another officer's gun is visible

9

in the lower right corner of the frame, indicating an officer is standing on the passenger's side of the vehicle, pointing his firearm at the passenger's side of the front windshield.  In the 40th second, a third plain clothes officer enters the frame.  Also in the 40th second, the Paseo becomes dislodged.

6:41 to 6:42.  The first gunshots are fired in the 41st and 42nd seconds.  In the 41st second, the third officer runs from the passenger's side to the driver's side, across the strip of grass, and onto the sidewalk in front of the Paseo.  This officer is wearing a tactical vest with "POLICE" across the chest, although the visibility of his chest is partially obstructed by the fourth officer entering the frame: Defendant Jones, who is wearing a black hooded sweatshirt and has his firearm drawn.

The Paseo begins to drive forward curving away from the Unmarked Street Crimes Taurus and heading through the space between the Unmarked Street Crimes Taurus and the telephone pole.  At this point, one officer is standing on the staircase, two officers are on the sidewalk, and Defendant Jones is still running in front of the telephone pole, across the strip of grass and onto the sidewalk.  (Dkt. 89-11 ¶ 32.)  By the time the Paseo is parallel to the Unmarked Street Crimes Taurus and is able to drive between the Unmarked Street Crimes Taurus and the telephone pole, all four officers are standing to the left of the car.  Defendant Jones, who was the last to run across the front of the Paseo, is the closest to the driver's window and discharges his firearm through the front windshield at the moment the Paseo begins to drive forward.  (Dkt. 89-11 ¶ 33.)  There is nothing in the record clarifying the distance between Defendant Jones and the Paseo; based on Officer Coleman's

dash cam footage, the distance appears to be a few feet.  (*See* Dkt. 85-18 at 9:53.) By the end of the 42nd second, Defendant Jones discharges his firearm three times. (*See* Dkt. 85-16 at 6:42.)  Immediately after these shots are discharged, an officer in the Marked SUV screams, "Oh f--k."  Once the SUV arrived at the scene, this is the only discernible statement made before the officers began shooting at the Paseo's occupants.

6:43 to 6:47.  The Paseo exits in the space between the telephone pole and the Unmarked Street Crimes Taurus in the 43rd second and drives along the sidewalk on Chapman Court in the direction of the elementary school, away from the NBPD vehicles.  In the 43rd second, the Paseo drives past the telephone pole and swerves across the driveway on the sidewalk.  During the 44th and 45th second, Defendant Kiely, who was the plain clothes officer standing in the driveway, shoots three times at the Paseo while he is backing up and holding the gun with one hand.  (Dkt. 89-11 ¶ 39.)  Defendant Kiely explained in his sworn statement:  "I backed up a few steps into a driveway and as the Toyota narrowly passed by me, I aimed at the driver and took one shot at his head.  The driver's side window was up when I took my first shot.  I remember the driver looking at me and ducking down as I shot."  (Dkt. 85-6 (Summ. J. Ex. C, Kiely Stmt.) at 5–6.) Defendant Slavin enters the frame in a black hooded sweatshirt with his hood up, running onto the sidewalk and discharging his firearm at the back of the Paseo as it flees the scene.  (Dkt. 89-11 ¶ 43.)

Once the Paseo is out of the dash cam's frame at the 47th second, gunshots can still be heard.  It is undisputed that Defendant Slavin continued to discharge

his firearm at the back of the Paseo once it crossed Chapman Court onto Chapman Street, and Defendants Ratajczak and Nelson also discharged their firearms in pursuit of the fleeing Paseo.  (*Id.* ¶¶ 45–47.)  Defendants Ratajczak, Slavin and Nelson shot at the passengers of the moving Paseo 11, nine, and two times respectively.  (*Id.* ¶¶ 45–47, 49, 52.)  As the video continues, there is no longer anything to view in the dash cam's frame.

### D.   Arrest

The Paseo eventually crashed into an unoccupied pickup truck on Chapman Street.  (Dkt. 89-11 ¶ 54.)  Defendant Jones approached the driver's side and saw Mr. Dowdell had a gunshot wound in his neck.  (*Id.* ¶ 59.)  According to Defendant Kiely, Mr. Dowdell attempted to speak and kept saying he could not breathe.  (Dkt. 89-5 (Opp'n Ex. 5, Kiely Depo.) at 66:24–67:2.)  Mr. Dowdell sustained bullet wounds to the back of his head; the back right side of his neck, which exited through his mouth; his upper left leg in which the bullet passed into his upper right leg; and his left hand.  (Dkt. 85-4 at 3, 59.)  He was transported to St. Francis Hospital in Hartford where he was pronounced dead.  (*Id.* at 3.)  It is unclear whose gunshot rendered the fatal wound.  (*See* Dkt. 85-4 at 59.)

The backseat passenger, Noah Young, attempted to crawl out of the rear window of the two-door car.  (*Id.* ¶ 56.)  Defendant Nelson and Detective Smith apprehended Young, who suffered minor injuries to his upper right arm.  (*Id.* ¶ 57; *see* Dkt. 85-4 at 7.)  He was taken to NBPD Headquarters and then to the Hospital of Central Connecticut in New Britain to treat his arm injuries.  (Dkt. 85-4 at 4–5.)

Defendant Ratajczak removed the front passenger, Caleb Tisdol, from the car.  (Dkt. 89-11 ¶ 58.)  Tisdol informed Defendant Slavin that he was 15 years old.  (Dkt. 85-4 at 21.)  He had been shot twice: in his upper right leg and lower left leg.  (*Id.* at 3, 21.)  Tisdol was transported to Connecticut Children's Medical Center in Hartford where he was treated for his gunshot wounds.  (*Id.* at 3–4.)

E.    Subsequent Investigation

More than a year after the incident on Friday, January 18, 2019, NBPD's Shooting Review Board convened to examine the five officers' use of their firearms that resulted in Mr. Dowdell's death.  Several reports memorializing the Shooting Review Board's findings have been submitted into the record.  (*See* Dkts. 89-1 (Opp'n Ex. 1, NBPD Mem., Steck); 89-2 (Opp'n Ex. 2, NBPD Mem., Gray); 89-4 (Opp'n 4, NBPD Mem., Chute); & 89-9 (Opp'n Ex. 9, NBPD Mem., Wardwell).)

The first two reports are dated January 23, 2019, and were written by two members of the Shooting Review  Board, Captain William Steck and Sergeant Thomas Gray, for Deputy Chief Christopher Chute's review.  (Dkt. 89-1; Dkt. 89-2.)  With respect to the first report, Captain Steck was tasked with identifying the NBPD's planning and tactical deficiencies during the fatal shooting on December 14, 2017.  Prior to deployment on December 14, 2017, the NBPD did not discuss a tactical plan, the three units were separately briefed about the robbery complaints and the Paseo but the NBPD did not have a joint meeting to create a cohesive plan, and no supervisor or commander was designated in charge.  (Dkt. 89-1 at 1–2.)  During the incident, personnel utilized three different tactical disciplines—a) felony motor vehicle stop, b) motor vehicle pursuit, and c) rapid vehicle take-down—all of

13

which were improperly executed.  (*Id.* at 2.)  They did not use their emergency lights or sirens to indicate police presence.  (*Id.*)  No one on scene had received pursuit training other than at the academy level.  (*Id.* at 3.)  The road block "was accomplished loosely at best."  (*Id.*)  Captain Steck made the following observation:

> Officers began to exit their respective vehicles from all directions prior to having contained and immobilized the suspect vehicle.  As a result of having done so they placed themselves in danger of being struck by the suspect vehicle.  Their approach to the suspect vehicle from all angles created a very dangerous cross-fire, "blue on blue" situation.

> The officers exiting their respective vehicles, from all directions closing the distances between themselves and the suspect vehicle was not a tactic consistent with Felony Motor Vehicle Stop procedures, nor was it a tactic consistent with RVTD techniques/procedures.

(*Id.*)  In summary, the report recommended better pre-operation briefing, the use of SWAT team members for instances such as this, and more training.  (*Id.* at 4.)

Similar to Captain Steck, Sergeant Gray's assignment was to suggest which policies and procedures should be changed.  (*Id.* at 1.)  He determined that personnel were not properly identifiable as NBPD that night, personnel did not have necessary equipment, the operation lacked pre-planning, personnel required more training, and there was no central command.  (*Id.*)  Sergeant Gray suggested changes to policy based on these observations.

Two days later on September 25, 2019, Deputy Chief Chute issued the Shooting Review Board Report for Chief of Police James Wardwell.  (Dkt. 89-4.) According to the protocol in the Report, each of the seven members of the Shooting Review Board reviewed relevant evidence, which included the Connecticut State Police's investigation and the State Attorney's final report.  (*Id.* at 1.)  The State's

14

Attorney determined all five officers were justified in their use of deadly force, and the Shooting Review Board members unanimously agreed to accept this ruling. (*Id.* at 2.)  The Shooting Review Board concluded the officers did not violate any policies or codes of conduct.  (*Id.* at 2–3.)  The remainder of the Report identifies the "Best Practices" recommendations from the Shooting Review Board, which includes the information described in Captain Steck's and Sergeant Gray's reports. (*Id.* at 3–7.)

In the final report, Defendant Wardwell accepted the Shooting Review Board's findings and recommendations.  (Dkt. 89-9.)  This report has the same date as Deputy Chief Chute's report.  (*Id.* at 1.)

## II.    PROCEDURAL HISTORY

Plaintiff filed this action on September 21, 2018.  (Dkt. 1 (Compl.).)  On the parties' request, the Court briefly stayed this case from December 5, 2018 until January 18, 2019, while the State's Attorney's investigation into the individual Defendants' use of force was pending.  (Dkt. 19 (Order).)  Discovery commenced when the case reopened.  On March 3, 2020, the parties again moved to stay the case due to Young's and Tisdol's ongoing state prosecutions.  (Dkt. 49 (Mot. Stay II).)  The Court again stayed the case, and it remained administratively closed until June 2, 2021.  (Dkt. 54 (Order).)   Upon reopening the case, the Court issued a Scheduling Order that it later modified twice at the parties' requests.  (Dkts. 60 (Scheduling Order); 69 (Am. Scheduling Order); 75 (Second Am. Scheduling Order).)  Defendants thereafter timely filed their Motion for Summary Judgment on March 31, 2023.  (Dkt. 85 (Mot. Summ. J.).)  The motion is now fully briefed.

III.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Liberty Lobby*, 477 U.S. at 255; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

IV.    ANALYSIS

A.    Count One: Excessive Force Against Officer Defendants

The Fourth Amendment protects individuals from unreasonable seizures.  U.S. Const. amend. IV.  A police officer's use of force constitutes a "seizure" for the purposes of the Fourth Amendment.  *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  The reasonableness of a seizure is dependent on "the nature and quality

of the intrusion on the individual's Fourth Amendment interests" balanced against "the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985).

A police officer who violates an individual's Fourth Amendment rights by conducting an unreasonable seizure may nonetheless enjoy freedom from liability. "The doctrine of qualified immunity protects 'government officials performing discretionary functions' from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Second Circuit utilizes a two-step framework derived from the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001).  *Jones v. Treubig*, 963 F.3 214, 224 (2d Cir. 2020).  That is, "when an official raises qualified immunity as a defense, the court must consider whether: '(1) … the official violated a statutory or constitutional right, and (2) … the right was clearly established at the time of the challenged conduct." *Id.*

Defendants argue that summary judgment should be granted as to Plaintiff's excessive force claim against the Officer Defendants for two reasons.  First, Defendants did not violate Plaintiff's constitutional rights, because their use of force was objectively reasonable in light of the surrounding circumstances.  Second, if the Court decides their conduct was objectively unreasonable, they  are nonetheless entitled to qualified immunity because they did not violate clearly established law.  In other words, Defendants challenge both prongs of the qualified

17

immunity framework.  Plaintiff opposes both arguments.  Because Defendants' analysis of facts and law focus on qualified immunity, the Court will do the same.

i.     *Was the Force Used by the Officer Defendants Excessive in Violation of His Constitutional Rights?*

Where a plaintiff contends the officer's use of force is excessive, the reasonableness inquiry is, as in other Fourth Amendment contexts, "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  A court evaluates "reasonableness" from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*.  While an officer is "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," this is not to say that an officer's motivation or intent is relevant.  *Id.* at 397.  Rather, the court must consider the "facts and circumstances of each particular case, including the severity of the crime underlying the arrest, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to flee."  *See id.* at 396.

When it comes to a fatal shooting, "[t]he intrusiveness of a seizure by means of deadly force is unmatched."  *Garner*, 471 U.S. at 9.  An officer may not use deadly force simply "to prevent the escape" of a felony suspect.  *Id.* at 11.  Instead, the United States Supreme Court constrains officers to the following rule: deadly force "may not be used unless it is necessary to prevent the escape and the officer has

18

probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Id.* at 3;  *Cowan ex rel. Estate of Cooper v. Breen*, 353 F.3d 756, 762 (2d Cir. 2003); *see generally Brosseau v. Haugen*, 543 US. 194, 203 (2004) (J. Stevens, dissenting) ("[T]he only issue in a 'deadly force' case is whether the facts apparent to the officer justify a decision to kill a suspect in order to prevent his escape.")  "It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect." *Garner*, 471 U.S. at 11.

The Officer Defendants argue they are entitled to qualified immunity, because they reasonably believed it was necessary to discharge their firearms. Because the reasonableness of the officers' use of force is based on the facts and circumstances specific to this particular case, *see Graham*, 490 U.S. at 396, the Court starts with the relevant undisputed facts supported by the record.  It is undisputed that, on December 14, 2017, NBPD officers identified a Paseo that they believed was involved in at least one "carjacking style" robbery three days earlier. (Dkt. 89-11 ¶ 2.)  While the Paseo matched the victim's description of the car, the only information NBPD had about the suspects was that there were between three and five suspects, all of whom were Black with the possible exception of one person who was Hispanic.  Besides ethnicity, the only other description the officers had was that one Black male was "5'8" tall [with a] skinny build."  (*See* Dkt. 85-4 at 2, 16; 85-5 at 1; 89-11 ¶¶ 3–4.) The scant description of the suspects is insufficient for any officer to have identified the occupants of the car as a perpetrator of the

robberies.  *See generally, United States v. Swindle*, 407 F.3d 562, 659–70 (2d Cir. 2005) ("[C]ourts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.") There is also no evidence that any NBPD officer had a reasonable basis to believe these individuals were armed.  (*Id.*; Dkt. 89-5 at 55:13–21, 65:21–66:5.)  In sum, there is no evidence in the record that the Officer Defendants had a reasonable basis to believe the occupants of the Paseo were the robbery suspects or were armed and dangerous.

Upon locating the Paseo, NBPD dispatched several vehicles to follow the car and attempt to block it.  (*Id.* ¶ 17–18.)  At no point did NBPD vehicles ever use their emergency lights or sirens to identify themselves.  (Dkt. 89-1 at 2.)  The Paseo drove onto Chapman Street, which was part of a three-street horseshoe.  (Dkt. 89-11 ¶ 20.)  Unmarked Cars followed behind the Paseo and two Marked Cars blocked Carlson Street, the parallel street on the horseshoe[3].  (*Id.* ¶¶ 19–22.)  The Paseo stopped and then reversed a quarter turn and, at that point, the Unmarked Acura and the Paseo collided.  (*Id.*)  The Paseo reversed more; the Unmarked Street Crimes Taurus, which was still in motion, and the Paseo also collided.  (*Id.* ¶ 23.)  As the Paseo continued to reverse, the rear of the Paseo drove over the sidewalk and became stuck.  (*Id.*  ¶ 24.)  Several officers exited their vehicle with their guns drawn, and some ran across the front of the Paseo to the driver's side of the car.

---

[3] Although the Marked Cars blocked the road, the record indicates they did not direct Mr. Dowdell to stop or otherwise signal—whether with lights, sirens, megaphones, or their voices——why they were blocking the road.  There are many reasons why police cars might be blocking a road; for example, it is possible the Marked Cars were parked there for road work, because of a school event, or for some other reason unrelated to the Paseo.

(*See id.* ¶ 25.)  The Paseo became unstuck and drove forward.  (*Id.* ¶ 29.)  The Officer Defendants shot at the occupants of the vehicle.  (*See id.* ¶¶ 33, 39, 43–45, 49, 52.)

The following is disputed:  Whether the Paseo hit the police vehicles or the police vehicles hit the Paseo.  The Paseo's speed when it reversed.  What the officers said when they exited their vehicles.  The Paseo's speed when it drove forward.  Whether the Paseo was ever in a position where it reasonably could have hit any of the officers.

The uncertainty in this case is similar to *Cowan ex rel. Estate of Cooper v. Breen*, a case in which the Second Circuit concluded that disputed questions required a jury's evaluation at trial.  There, Officer Michael Breen was patrolling North Branford early in the morning and observed a parked Camaro with two suspicious occupants, a man and a woman.  *Cowan*, 353 F.3d at 758.  As the Camaro drove away,  Breen followed it, observed erratic driving, flashed its lights and executed a vehicle stop.  *Id.*  When neither the male driver nor the female passenger had their driver's licenses, Breen ordered the driver out of the car and searched his person, discovering narcotics.  *Id.*  Breen tried to arrest the driver, but the driver fled on foot and Breen lost him in the woods, eventually returning to his cruiser.  *Id.*  At that point, the female was sitting in the driver's seat of the Camaro.  Breen fired his gun twice and killed the woman with his second shot.  The parties disputed whether the Camaro was moving; if so, at what speed; whether Breen signaled the Camaro to stop; and the distance between Breen and the Camaro when he fired his gun.  The Second Circuit explained that "resolution of whether a constitutional violation occurred centers on whether at the moment

Breen decided to fire at the Camaro, he reasonably believed that the approaching vehicle put his life or person in danger." *Id.* at 762.  Plaintiff's evidence showed the Camaro was traveling slowly, Breen was to the side of the car when he fired the fatal shot, Breen did not warn the Camaro to stop, and the vehicle did not move suddenly—all these facts, the Second Circuit concluded, "suggests that no reasonable officer in Breen's position would have believed that at the crucial moment use of deadly force was necessary." *Id.* The plaintiff's expert also stated that proper police procedure would have been to get out of the way of an oncoming vehicle rather than shoot, "since shooting may disable the car or the driver and put the police officer (and any bystanders) in even greater danger." *Id.*

Here, in applying *Cowan*'s reasoning, the Court would not be able to conclude the officers' conduct was objectively reasonable unless it also accepted as true Defendants' versions of the facts, i.e., that the Paseo was driving in the direction of the officers on foot and that it was traveling fast enough to cause significant harm or death. *See Cowan*, 725 F.3d at 762 (finding qualified immunity not warranted at summary judgment if there are disputed issues of fact about the reasonableness of the defendant's conduct). Unlike the parties in *Cowan*, neither Plaintiff nor Defendants have submitted forensic or expert evidence of the Paseo's rate of speed, where exactly the officers were standing, and whether the Paseo could have struck the officers in the seconds when it drove away.  The Court will not draw conclusions about these disputed facts at this stage of litigation.

Because the reasonableness of an officer's conduct is so fact-specific, sufficiently analogous cases are few and far between.  One such case is *Estate of*

*Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), a 30-year-old Seventh Circuit case that is surprisingly similar to the case before this Court.   The Indianapolis Police Department received a complaint of a stolen yellow cab at 9:00 pm and, shortly after, two marked police cars parked behind a yellow cab parked next to another car in a Taco Bell parking lot.   *Id.* at 232.   Three uniformed officers exited their vehicles and one of them attempted to open the driver's door, ordering the driver, Damon Starks, to exit.   *Id.*   Instead, Starks locked the cab doors and slowly reversed into one of the police cars; he then drove forward but his exit was blocked by a utility pole, so he reversed again giving himself more space from the utility pole. *Id.*   One of the officers, Officer Black, was standing behind the utility pole at that point.   *Id.*   When Starks put the car in drive again, he floored the accelerator. It was undisputed that Officer Black moved from behind the utility pole in front of the cab and that all three officers discharged their firearms, killing Starks.   *Id.*   The parties disputed whether the officer moved from behind the utility pole <u>before</u> or <u>after</u> the yellow cab accelerated forward.   *Id.* at 233.   The Seventh Circuit ruled that it lacked jurisdiction over the qualified immunity appeal, because the officers' actions were objectively unreasonable according to plaintiff's version of the record.    In remanding the case for trial, the Seventh Circuit stated, "The key dispute for the factfinder will be whether Black stepped in front of Starks' rapidly moving cab, leaving Starks no time to brake."   *Id.* at 234.   The Seventh Circuit explained the possible outcomes:

> If he did, then Officer Black would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, because the decedent would have been unable to react in order to avoid presenting a deadly threat to Black. On the other hand, if

**Black was in the path of the car before the car started forward or if the factfinder concludes that Starks could have braked but chose not to, then the three defendants reasonably responded to Starks' acceleration toward Black. Starks would have threatened the life of a police officer, and reasonable officers could believe that the use of deadly force was appropriate.**

*Id.* at 234.

The factfinder in this case will be required to answer nearly identical questions. That is, did one or multiple officers jump in front of the moving Paseo, leaving no time to break? Were the officers already in the Paseo's path before the car started to move? Could Mr. Dowdell have stopped the Paseo but chose not to? Or a question not at issue in *Starks*, did Mr. Dowdell drive the Paseo toward the officers? Perhaps belaboring the point, these questions are for the jury to decide.

The Court notes that all Officer Defendants admit to shooting at the Paseo's driver—as opposed to firing warning or disabling shots—but they offer several justifications for discharging their firearms. (*See* Dkt. 85-4 at 12, 15, 20, 24, 26.) <u>First</u>, all five Officer Defendants purportedly believed the Paseo was either (a) traveling towards them and would strike them (i.e., Defendants Jones and Kiely) or (b) was in danger of striking another NBPD officer or member of the public (i.e., Defendants Nelson, Ratajczak and Slavin). (Dkt. 85-2 ¶¶ 32, 38, 41–42, 46–50.) The record indicates that NBPD officers chose not to use sirens or lights so that they could remain undetected. It was only after the officers surrounded the Paseo without any warning that the car began to drive away. An individual's flight is not a justification for using deadly force, especially when the flight is precipitated by the officers. *See Garner*, 471 U.S. at 11. As explained above, whether the Paseo's

direction and speed posed a "significant threat of death or serious physical injury to the officer or others" is a question of fact for the jury. *Cowan*, 352 F.3d at 764.

        <u>Second</u>, Defendant Slavin also stated that he discharged his firearm because he heard gun shots and believed the suspects from the previous robberies were the occupants of the vehicle and armed. (*Id.* ¶¶ 41–42.) It is undisputed that no one from inside the vehicle fired a shot but that five NBPD officers discharged their firearms a total of 28 times within a matter of seconds, all aiming at Mr. Dowdell. (*Id.* ¶¶ 33, 39, 45, 49, 52.) In addition, there is no evidence in the record that the officers knew anything about the occupants of the vehicle on December 14, 2017 (other than that there were three of them), that there was any reason to believe those occupants would be the same as the people who participated in either robbery three days earlier, or that they would be armed. Indeed, shooting to kill the driver of a moving vehicle would surely pose a danger to bystanders, especially in the early evening of a residential area in a school zone where there might be children participating in after-school activities or adults arriving home from work. *See generally, Cowan*, 353 F.3d at 762 (discussing expert testimony that shooting a driver or car could pose danger to the community). Accordingly, based on this evidence alone at this stage of litigation, the Court cannot conclude that Defendant Slavin had probable cause to believe that the Paseo's occupants were armed or that the shots fired came from anyone other than the police, who exited their vehicles with weapons drawn. *See Carvajal v. Mihalek*, 453 F. App'x 69, 72 (2d Cir. 2011) (explaining it was up to the jury to determine whether the officer had probable cause to believe the plaintiff was holding a weapon); *see generally United States v.*

*Arvizu*, 534 U.S. 266, 274 (2002) (stating "[a]n officer's reliance on a mere 'hunch'" does not even rise to reasonable suspicion, let alone probable cause).

**Third**, Defendant Nelson believed an officer was being dragged under the car, even though it is undisputed that this belief was incorrect and no other officer on the scene had this vision.  (*Id.*)  As with the other justifications, it will be up to the jury to review the video evidence, along with the other trial evidence, and decide whether his mistaken belief about the dragged body was an objectively reasonable basis to discharge his firearm.

Defendants argue three Supreme Court cases involving a suspect fleeing in a car—*Brosseau v. Haugen*, *supra* at 19, *Plumhoff v. Rickard*, 572 U.S. 765 (2014), and *Mullenix v. Luna*, 577 U.S. 7 (2015)—establish the objective reasonableness of their conduct.  (*See* Dkt. 85-1 at 17–25.)   As an initial matter, *Brosseau* is inapplicable, because the Supreme Court did not assess the constitutionality of the police officer's conduct.[4]  *See Brosseau*, 543 U.S. at 198 ("We express no view as to the correctness of the Court of Appeals' decision on the constitutional question itself.").  *Plumhoff* and *Mullenix* are distinguishable, because they involved high-speed car chases in which the suspect was putting innocent civilians at risk.  *See Plumhoff*, 572 U.S. at 776 (concluding the suspect "posed a grave public safety risk" because the car chase "exceeded 100 miles per hour and lasted over five

---

[4] To the extent Defendants believe *Brosseau* applies to the second qualified immunity factor, enough facts were undisputed so that the court could rule on qualified immunity. For example, the officer had particularized information about the individual suspect, the suspect evaded capture on foot for more than 30 minutes, the officer attempted multiple times to detain the suspect without use of force, and the suspect was shot only when he began driving in an area with innocent people known to be in nearby cars.  These facts are significantly different than the circumstances in this case.

minutes," and multiple drivers "were forced to alter course"); *Mullenix*, 577 U.S. at 18 ("The fact is that when Mullenix fired, he reasonably understood Leija to be a fugitive fleeing arrest, at speeds over 100 miles per hour, who was armed and possibly intoxicated, who had threatened to kill any officer he saw if the police did not abandon their pursuit, and who was racing towards Officer Ducheneaux's position.").  There is no evidence of a car chase or that innocent civilians were in the area.

In *Thevenin v. French*, 850 F. App'x 32 (2d Cir. 2021), the Second Circuit rejected the application of *Brosseau*, *Plumhoff* and *Mullenix* to facts lacking a high-speed chase or innocent people in the immediate vicinity.  The *Thenevin* facts instead involved a "low to average" chase ending with the decedent's car hitting a concrete barrier on a bridge.  According to the plaintiff's version of the facts, the decedent's car was not moving, the officer exited the vehicle and fired multiple shots at the driver, and it was only after those fatal shots were fired that the car slowly rolled forward, pinning the police officer to his vehicle.  As with *Thevenin*, this Court will not apply *Brosseau*, *Plumhoff* and *Mullenix* reasoning to facts that are decidedly different.

ii.     *Was the Law Clearly Established?*

A defendant is not entitled to qualified immunity if the "constitutional right that the defendant allegedly violated 'was clearly established at the time of the alleged violation.'"  *Bangs v. Smith*, --- F.4th ---, 2023 WL 6627796, at *5 (2d Cir. 2023); *c.f. Brosseau*, 543 U.S. at 198 (stating an officer is protected by qualified immunity if he "makes a decision that, even if constitutionally deficient, reasonably

misapprehends the law governing the circumstances [he] confronted"). To evaluate whether a right is clearly established, the Court must determine whether it would be clear to a reasonable police officer that his conduct in these circumstances was unlawful. *See Saucier*, 533 U.S. at  202.

As explained above, the Second Circuit has long made clear that "under the Fourth Amendment it 'is not objectively reasonable for an officer to use deadly force unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan*, 352 F.3d at 764 (quoting *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29 (2003)).  If a jury concludes that Defendants reasonably believed the Paseo could have killed or seriously injured them or others, then Defendants are entitled to qualified immunity.  But like the *Cowan* court explained, "this question—whether it was reasonable for [the shooter] to believe that his life or person was in danger— is the very question upon which we have found there are genuine issues of material fact."  *Cowan*, 352 F.3d at 764.  For the same reasons the Second Circuit reversed and remanded *Cowan*, this Court denies summary judgment on qualified immunity grounds.

Recently, the Second Circuit confirmed the soundness of *Cowen*'s reasoning in *Washington v. Rogozinski*, No. 22-1019-cv, 2023 WL 7014137 (2d Cir. Oct. 25, 2023).  The underlying facts concerned an altercation between the plaintiff and three Hospital of Central Connecticut employees in the hospital's parking lot, which led to the plaintiff's arrest and prosecution for breach of peace.  On summary judgment, the defendants argued they were entitled to qualified immunity.

Because the parties disputed the bulk of the material facts—including who assaulted whom—the lower court denied summary judgment on the grounds that it could not rule on qualified immunity until the factual disputes were resolved by the jury.  The defendants filed an interlocutory appeal.  The Second Circuit agreed with the lower court, holding it lacked jurisdiction to address qualified immunity due to the factual disputes.  Had the defendants "accept[ed] the plaintiffs' version of the facts for purposes of the appeal ... [and] argu[ed] that the facts asserted by the plaintiffs entitle them to the defense of qualified immunity as a matter of law," the Second Circuit would have had jurisdiction over the appeal.  *Id.* at *1 (internal quotation marks removed).  The Second Circuit explained, "But a careful review of their brief shows that the Officers do not actually accept Washington's version of the events for purposes of this appeal."  *Id.*  Just as the *Washington* defendants failed to accept the plaintiffs' facts, the Officer Defendants in this case fail to accept Plaintiff's assessment of the record.  For the same reasons that the lower court denied summary judgment and the Second Circuit lacked jurisdiction to hear the appeal, this Court must deny summary judgment as well.

In following the Second Circuit's guidance in *Cowan* and *Washington*, summary judgment is DENIED as to Count One.  The Court will make a qualified immunity determination once the jury decides material, disputed issues of fact including whether the Paseo traveled towards the officers, whether the officers were in danger, and whether the Paseo could have posed a danger to other community members.  *See id.*

**B.**   <u>Count Two: Indemnification Against City of New Britain</u>

Count Two is an indemnification claim brought under section 7-465 of the Connecticut General Statutes.  In general terms, this provision requires a town, city or borough to pay "all sums" which an employee who "was acting in the performance of his duties and within the scope of his employment" then "becomes obligated to pay by reason of the liability … for damages awarded for infringement of any person's civil rights or for physical damages to person or property" so long as the liability is "not the result of any wilful or wanton act of such employee in the discharge of such duty."  Conn. Gen. Stat. § 7-465(a).

Defendants seek summary judgment at to this Count on the grounds that the Officer Defendants are entitled to qualified immunity.  Plaintiff did not oppose Defendants on the indemnification count.  It is well-established that this statute "imposes no liability upon a municipality for breach of any statutory duty of its own."  *Ahern v. City of New Haven*, 190 Conn. 77, 82 (1983).  That being said, a derivative action may proceed to trial along with the underlying count.  *See Ravalese v. Town of East Hartford*, No. 3:16-cv-1642 (VAB), 2019 WL 2491657, at *18 (D. Conn. June 14, 2019) (quoting *Myers v. City of Hartford*, 84 Conn. App. 395, 401 (2004)).  Practically speaking, this means the City of New Britain's duty to indemnify will attach if an Officer Defendant is found liable and the conduct does not fall within the wanton/wilful exception.  *See id.*, 2019 WL 2491657, at *18.  Because Defendants are not entitled to qualified immunity at this stage of litigation, this determination cannot be made on summary judgment.  Therefore, as to Count Two, summary judgment is DENIED.

30

**C.**    **Count Three: *Monell* Liability Against City of New Britain and Chief Wardwell**

A municipality is a "person" under section 1983 and may be sued for violations of an individual's constitutional rights.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023).  A municipality is not, however, liable on a *respondeat superior* theory.  *See Monell*, 436 U.S. at 691, 694 (explaining "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents").  "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Monell*, 436 U.S. at 694)); *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (requiring a plaintiff to "demonstrate that any constitutional harm suffered was the result of a municipal policy or custom" in order for § 1983 liability to attach to a municipality).

"To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation." *Patterson v. Cnty of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Sorlucco*, 971 F.2d at 870–71).  It must, however, be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006).  Put another way, while a custom need not have "formal approval through the body's official decisionmaking channels," it must be "persistent and widespread" such that it is "so permanent and well settled as to constitute a 'custom or usage' with the force of law, and

thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (internal quotation marks omitted); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.")  A municipality may also be liable for its failure to train or supervise employees if the failure "display[s] a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Connick*, 563 U.S. at 61 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996)); *Riccio v. Town of Old Saybrook*, No. 3:21-CV-821 (SVN), 2022 WL 4585650, at *2 (D. Conn. Sept. 29, 2022) (identifying one type of *Monell* liability as "a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact").   Liability does not extend, however, to a one-off instance of unconstitutional conduct from a "single, low-level officer," as doing so would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*."  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985).

Pursuant to section 51-227a of the Connecticut General Statutes, the Connecticut Division of Criminal Justice and the State Police Major Crime Division (Central Region) investigated the Officer Defendants' fatal shooting of Mr. Dowdell on December 14, 2017.  The investigation was then given to a state attorney who, on behalf of the Chief State's Attorney's Office, determined the officers' use of deadly force was justified.  (Dkt. 89-4 at 2.)   The Shooting Review Board unanimously agreed to accept the determination.  (*Id.*)

Notwithstanding the Shooting Review Board's conclusion, it still determined NBPD's actions on December 14, 2017, fell short of "Best Practices." (*See id.* at 6–7.)  Based on the two Shooting Review Board members' internal reports in the record, the NBPD personnel who responded to the scene failed in myriad respects, including but not limited to: (1) they failed to create a tactical plan on December 13 or 14; (2) the three units that were deployed never met, discussed or otherwise ensured a coordinated effort; (3) the "unity of command principle was not followed" insofar as no supervisor or commander was designated in charge; (4) the officers failed to adhere to one tactic, using portions of a felony motor vehicle stop, a motor vehicle pursuit, and a rapid vehicle take-down; (5) not all of the deployed officers were "properly trained on dynamic vehicle take downs or vehicle stabilizations" and the SWAT team—the only team that receives regular training on rapid vehicle take-down—was not deployed; (6) no one at the scene used emergency lights or sirens to identify officer presence; (7) officers exited their vehicles before containing the vehicle, creating a "very dangerous cross-fire, 'blue on blue' situation;" (8) several officers, including Officer Defendants, failed to wear clothing that adequately identified them as police officers; and (9) some officers lacked gear, including weapon lights or flashlights.  (Dkts. 89-1 & 89-2.)

Captain Steck of the Shooting Review Board described these failures as "not being consistent with any one specific discipline based on department policy and training."  (Dkt. 89-1 at 1.)  The Court is troubled by the NBPD's decision to describe the failures on December 14, 2017, as "Best Practices" deficiencies rather than planning and tactical failures that violated the standard policies and procedures.

33

(*See* Dkt. 89-9 at 3.)  It would seem that a department's tactical policy or training serves no purpose (and functionally does not exist) if the policies and procedures are mere suggestions and officers are not required to follow them.  The Chief's acknowledgement that "Best Practices … were not demonstrated" without finding any policy violation is tantamount to a senior policy-making official's endorsement or acquiescence of the NBPD's failure to follow its tactical procedures and failure to deploy properly trained officers.  *See Green*, 465 F.3d at 80 (stating a policy, custom or procedure need not be explicit as long as it implies "the constructive acquiescence of senior policy-making officials").  In other words, a reasonable jury could find that, by concluding the planning and tactical failures did not violate standard policies and procedures, the NBPD validated and established as proper performance the violations that put both the public and the officers in danger.  Given the depth and breadth of the NBPD failures leading to Mr. Dowdell's death— which were identified by NBPD's own personnel—the Court concludes there is a triable issue of fact as to whether the City of New Britain should be liable for Mr. Dowdell's death on December 14, 2017.

In addition, when it comes to the NBPD's failure to supervise, a  reasonable jury must be able to conclude that "inadequate supervision actually caused or was the moving force behind" the constitutional violation.  *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).  This is not a circumstance in which one low-level officer violated a constituent's constitutional rights.  Three entire units failed to properly prepare for the event, no one was in charge, and almost every officer that arrived at the scene improperly utilized NBPD tactics in one way or another.   A

reasonable jury could certainly conclude that the NBPD's "response was so patently inadequate to the task as to amount to deliberate indifference." *Id.*

Finally, the Court notes that Defendant Wardwell was sued in his official capacity.  (*See* Dkt. 39 (Am. Compl.) ¶ 7.)  "[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself."  *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005).  This means that Count Three pertains only to the City of New Britain even though Defendant Wardwell was also named in Count Three of the Amended Complaint.  Accordingly, the Court need not address Defendants' supervisory liability argument as that applies to suits against officials in their individual capacity. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (stating individual supervisory liability only attaches when the "Government-official defendant, through the official's own individual actions, has violated the Constitution") (internal quotation marks omitted).

V.    **CONCLUSION**

For the above reasons, summary judgment is DENIED as to all Counts.  The Joint Trial Memorandum is due on or before December 21, 2023.  The Clerk is directed to refer this case to a magistrate judge for a settlement conference.

**IT IS SO ORDERED**

_____

**Hon. Vanessa L. Bryant
United States District Judge**

**Dated at Hartford, Connecticut: December 4, 2023**